

U.S. Department of Justice

United States Attorney
Eastern District of New York

NS:EAG
F. #1997R04405

271 Cadman Plaza East
Brooklyn, New York 11201

February 1, 2021

By E-mail

The Honorable Frederic Block
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Justin Volpe
                  Criminal Docket No. 98-196 (FB)

Dear Judge Block:

        On December 13, 1999, the Honorable Eugene Nickerson sentenced the defendant Justin Volpe to 30 years' imprisonment following his convictions for (1) depriving Abner Louima of his civil rights by viciously assaulting and sodomizing Mr. Louima; and (2) depriving Patrick Antoine of his civil rights by assaulting Mr. Antoine, all on or about August 9, 1997. The defendant now seeks compassionate release in light of the ongoing COVID-19 pandemic. Because the Section 3553(a) factors continue to demand a sentence of 30 years, the government respectfully submits that the defendant's motion should be denied. Moreover, compassionate release is not warranted because the defendant does not fall within the population of those who are most vulnerable to suffer severe consequences upon contracting COVID-19 and the defendant has himself already recovered from a relatively mild case of COVID-19.

## BACKGROUND

        The crimes committed by the defendant are among the most horrific crimes prosecuted in this District and left a lasting harm on Mr. Louima, Mr. Antoine, New York City, the New York City Police Department and the country at large. The facts described here are largely taken from the facts set forth in Judge Nickerson's opinion in United States v. Volpe, 78 F. Supp. 2d 76 (E.D.N.Y. 1999).

A. The Offense Conduct

At approximately 4:00 a.m. on August 9, 1997, New York City Police Officers from the 70th Precinct, including the defendant Justin Volpe, responded to a nightclub located on Flatbush Avenue in Brooklyn, New York, after a large crowd gathered to watch a fight that had broken out. The officers attempted to disperse the crowd, but several of those who had gathered on the street became unruly, yelling and throwing bottles at the officers. Volpe struggled with an intoxicated patron named John Rejouis and eventually pushed Rejouis to the ground. Rejouis held up his badge as a New York City Corrections Officer. Volpe slapped Rejouis's hand and knocked the badge to the ground.

Shortly thereafter, Abner Louima confronted Volpe and began yelling at him regarding his treatment of Rejouis. Volpe attempted to push Louima away from the club, but Louima refused to move and the confrontation escalated. Volpe was then struck hard on the side of his head and knocked to the ground. Volpe mistook that Louima had hit him, when in fact Louima's cousin had struck Volpe (and then fled).

Officers who had seen Louima's cousin strike Volpe began chasing the cousin on Flatbush Avenue. Volpe joined the chase, thinking he was in pursuit of Louima. During the chase, Volpe encountered Patrick Antoine, an individual who had not been at the club and was simply on his way home. Volpe, who mistook Antoine for Louima (whom Volpe continued to incorrectly believe had hit him), yelled at Antoine and began beating him, using a flashlight to strike his head and face. Antoine suffered bruises and contusions on his head and a laceration over his right eye that required seven stitches. Several other officers then arrived and placed Antoine under arrest.

Later on the morning of August 9, 1999, Volpe provided false information to a local prosecutor regarding his assault on Antoine. He told the prosecutor that while he was attempting to place Louima in handcuffs, Antoine pushed and punched him and refused to be handcuffed. Volpe also swore out a complaint attesting to these facts and charging Antoine with felony assault, obstructing government administration in the second degree, and disorderly conduct.

Meanwhile, Louima had been arrested following his encounter with Volpe. Officers were driving Louima to the 70th Precinct in their patrol car when a description of the man who had assaulted Volpe was broadcasted over the police radio. Although he was not the assailant, Louima matched the description in the broadcast. Louima testified that the driver of the patrol car stopped in the vicinity of Nostrand Avenue and Glenwood Road, with Louima sitting in handcuffs in the back of the car. Louima further testified that both officers got out of the car, opened the rear door and began to beat him, at least once with an unidentified hard object, inflicting contusions and bruises.

The officers then drove to Glenwood Road and Bedford Avenue, where they radioed that they had in custody a suspect in the assault on Volpe. Volpe and his partner overheard this and drove to Glenwood Road and Bedford Avenue. Upon arrival and after a brief conversation with the other officers present, Volpe approached Louima, who was still

in handcuffs in the back of the patrol car. Volpe taunted Louima and beat him on his head and face with a closed fist and a radio. Louima sustained lacerations and abrasions on his face and swelling in his mouth and around his eye.

The officers then drove Louima to the 70th Precinct, where they began filling out paperwork regarding Louima. Louima was still in handcuffs, and while he was being processed his pants and underwear fell to his ankles. Volpe arrived at the precinct shortly thereafter. When he saw Louima at the front desk, he walked to the juvenile questioning room, where he grabbed a wooden broom stick and broke it over his knee. He placed the bottom of the stick behind a locker, took the upper section to the bathroom and put it behind a garbage can. Volpe then left the bathroom and walked to the front desk, where Louima was still being processed. Volpe borrowed a pair of leather gloves from another officer, who was standing near the front desk.

Louima testified that when the processing was finished, the driver of the car in which he was transported to the precinct grabbed him by the handcuffs and took him to the bathroom, his pants and underwear still around his ankles, forcing him to shuffle-step, and opened the door to the bathroom and took Louima inside, with Volpe following. Volpe then picked up the stick he had put behind the garbage can and told Louima, "I'm going to do something to you. If you yell or make any noise, I'll kill you." Volpe pushed Louima to the ground, with his head near a toilet bowl, and kicked him in the groin. When Louima began screaming, Volpe put his foot over Louima's mouth. Louima testified that the two officers began to punch him about the head and body, and that the driver of the car then grabbed Louima by his handcuffs and lifted him from the ground.

Volpe then forced the broken broomstick approximately six inches into Louima's rectum. He removed the stick, which was covered with Louima's feces, and held it in front of Louima's mouth and taunted him. Volpe then slammed the stick against the wall, leaving behind traces of feces. With Louima crying and in severe pain, Volpe lifted him to his feet and took him to a holding cell, leaving Louima's pants and underwear around his ankles. Before putting him in the cell, Volpe again told Louima that if he told anybody what had happened, Volpe would kill him. Volpe then returned the leather gloves, now covered with Louima's blood, to the officer from whom he had borrowed them.

Volpe later encountered Louima sitting on a chair outside his cell waiting to be taken to the hospital. Volpe cursed at Louima, pulled the chair away from him, and told him to return to the cell and get down on his knees.

Several of the officers involved in the events outside the nightclub, including Volpe, went to the New York Community Hospital on the morning of August 9, 1999, to be treated for minor injuries sustained during those events. At the hospital, Volpe was overheard telling fellow officers, "I broke a man down." Volpe later returned to the 70th Precinct, where he told a sergeant what he had done to Louima, saying "I took a man down tonight." Volpe took the sergeant to the bathroom and showed him the stick used in the sexual assault, which Volpe had left in the bathroom. Shortly thereafter, Volpe showed the

3

stick to another police officer. Smelling Louima's feces on the stick, the officer said, "What is that, dog shit?"; Volpe responded, "No, human shit." Volpe subsequently threw the broom handle into a trash bin outside the precinct.

Approximately four hours after the bathroom assault, Louima and Antoine were taken to Coney Island Hospital in Brooklyn, New York. Antoine received seven stitches to close the laceration on his head and was discharged later that day. Louima was initially diagnosed with swelling in his head and a laceration over his eye, but further tests showed internal injuries to his bladder and rectum. On the evening of August 9, 1997, doctors surgically repaired a two-centimeter perforation to Louima's rectum and a three-centimeter perforation to his bladder. Doctors also performed colostomy and cystostomy procedures.

Louima remained hospitalized for more than two months, until October 10, 1997. Among the complications he suffered was an intestinal blockage requiring emergency surgery and the implantation of a colostomy bag. Louima underwent surgery again in February 1998 to remove the colostomy bag. After his release from the hospital on October 10, 1997, Louima received medical and psychiatric treatment on an outpatient basis and continued to suffer severe headaches, abdominal pain and insomnia.

### B. Procedural History

The defendant surrendered to the FBI on February 26, 1998 and thereafter proceeded to trial. Jury selection began on April 14, 1999, and the trial itself on May 4, 1999. On May 25, 1999, three days before the scheduled close of the government's case in chief, Volpe pleaded guilty to six of the seven counts against him in the superseding indictment: (1) conspiring to deprive Abner Louima of his civil rights by aggravated assault and aggravated sexual abuse; (2) assaulting Louima in a police car; (3) sexually abusing Louima in a restroom at the 70th Precinct; (4) assaulting Patrick Antoine; (5) falsely arresting Antoine; and (6) witness tampering. That same day, the defendant was remanded.

On December 13, 1999, Judge Nickerson determined that the applicable Guidelines range was 360 months to life and sentenced Volpe to 360 months' imprisonment. In so sentencing him, he said, "Short of intentional murder, one cannot imagine a more barbarous misuse of power than Volpe's."

### C. The Defendant's Motion for Compassionate Release

On June 25, 2020, the defendant filed a request for compassionate release with the Warden of FCI Beaumont, where he is currently incarcerated. Volpe asserts that the Warden denied the request on July 14, 2020. In a filing received by the Court on December 23, 2020, the defendant seeks compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). The defendant asserts that there are extraordinary and compelling circumstances for his release. Specifically, the defendant argues that he contracted and recovered from COVID-19 in November 2020 and that his release is necessary to obtain treatment for any long-term effects of COVID-19. He also argues that his release is necessary more generally due to

4

COVID-19 and highlights that it is not possible to socially distance in the unit where he is housed at FCI Beaumont.

II.     Discussion

    A.     Applicable Law

Under Section 3582, the Court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).

Under Section 3582(c)(1)(A), a defendant may file a motion for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  If a defendant files a motion for compassionate release in Court without first making any request to the BOP, it must be denied as premature.  See 18 U.S.C. § 3582(c)(1)(A); see, e.g., United States v. Reese, No. 12-CR-629 (VM), 2020 WL 2554381, at *1 (S.D.N.Y. May 20, 2020) (denying motion because the defendant "has not yet exhausted his avenues for administrative relief with the BOP, and thirty days have not yet passed since Reese's April 24, 2020 request for compassionate release"; observing that the defendant's separate request from the BOP to be placed on home confinement is insufficient because it arises out of a different statutory scheme).  This exhaustion requirement exists for good reason—the knowledge and expertise of BOP staff can be of great value to the parties and the Court.  See 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf (BOP procedures providing that upon receipt of an application for compassionate release, BOP officials conduct an extensive and thorough assessment of, among other things, the inmate's particular conditions of confinement and the stated grounds for release).

If a defendant has properly exhausted his administrative remedies, then the relevant Sentencing Commission policy statement is U.S.S.G. § 1B1.13.  That statement provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," id. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," id. § 1B1.13(2); and "the reduction is consistent with this policy statement," id. § 1B1.13(3).

The Application Note describes the circumstances under which "extraordinary and compelling reasons exist":

(A) Medical Condition of the Defendant. —

5

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,
(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant. — The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family circumstances. —

A. The death or incapacitation of the caregiver of the defendant's minor child or minor children.
B. The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Id. § 1B1.13 app. n.1.

Regardless of the theory of "extraordinary and compelling reasons" under which a defendant proceeds, as noted above, the 18 U.S.C. § 3553(a) factors are relevant to whether release is warranted. See 18 U.S.C. § 3582; U.S.S.G. § 1B1.13.

The Guidelines and BOP policy have established clear criteria to aid in a court's determination of when compassionate release is appropriate pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). See U.S.S.G. § 1B1.13; see also BOP Program Statement 5050.50. Both the Guidelines and the BOP Program Statement primarily limit compassionate relief to cases of serious illness or impairment, advanced age or a need to care for a child, spouse or

6

registered partner.  See id.; see also United States v. Traynor, 04-CR-0582 (NGG), 2009 WL 368927, at *1 n.2 (E.D.N.Y. Feb. 13, 2009).  As the court recognized in Traynor, Congress noted that Section 3582(c)(1) "applies . . . to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner."  Id. at *1 (citing Senate Report No. 98–225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3304).  The Second Circuit recently held that a district court erred when it decided that the Guidelines limited a court's ability to consider releasing a defendant early, without input from the BOP, on any grounds beyond a showing of poor health, old age and family care needs, instead concluding that district courts can consider any potentially extraordinary and compelling reasons that a defendant might raise for compassionate release.  United States v. Zullo, 976 F.3d 228, 237–38 (2d Cir. 2020).[1]

As the proponent of release, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist.  See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); United States v. Gotti, No. 02-CR-743 (CM), 2020 WL 497987, at *5 (S.D.N.Y. Jan. 15, 2020) (defendant "has the burden of showing that 'extraordinary and compelling reasons' to reduce his sentence exist").

B.      Discussion

The defendant brings the instant motion for compassionate release under the fourth category, the "other reasons" provision, arguing that his sentence should be reduced.  For the reasons set forth below, the defendant's motion should be denied.

1.      There are No Extraordinary and Compelling Reasons for Release

First, the defendant has failed to demonstrate an extraordinary and compelling reason for any sentence reduction, let alone the drastic one he seeks here.  The defendant argues that the Guidelines are no longer mandatory and therefore if he had been sentenced

---

[1] The government respectfully submits that Zullo was wrongly decided.  In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission the authority to define the term "extraordinary and compelling reasons."  The First Step Act altered only the procedural mechanism in § 3582(c)(1) and did not revoke the authority delegated to the Commission in § 994(t), or purport to expand the basis for compassionate release beyond the categories identified by the Sentencing Commission in the application note to U.S.S.G. § 1B1.13.  Indeed, Congress expressly limited courts' discretion to grant compassionate release by requiring that any such sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," which, the government asserts, includes § 1B1.13.  See Dillon v. United States, 560 U.S. 817, 819 (2010).  Nevertheless, the government acknowledges that Zullo is currently binding authority in this Circuit.  For the reasons set forth herein, however, it does not compel the result urged by the defendant.

7

today, he might have received a lower sentence. However, this purported legal injury does not constitute an "extraordinary and compelling" reason even under Zullo.

It is true that, in Zullo, the Second Circuit explained that "Application Note 1(D) [of U.S.S.G. § 1B1.13] cannot constrain district courts' discretion to consider whether any reasons [presented in a motion for compassionate release] are extraordinary and compelling." Zullo, 976 F.3d at 236. But Zullo does not undermine, much less defeat, the government's argument that, in the First Step Act, Congress did not intend to grant district courts authority in § 3582(c) to address purely legal injuries like that asserted by the defendant. That argument presents a question of statutory interpretation and, as the Second Circuit explained in Zullo, "[a]s with most cases of statutory interpretation, we begin with the text." Zullo, 976 F.3d at 234.

The text of § 3582(c)(1)(A) and the tools of statutory construction do not support the defendant's understanding of the statute. For some 40 years, the concept of "compassionate release" and the phrase "extraordinary and compelling reasons" have referred to a discrete set of personal circumstances other than rehabilitation, and they have never referred to legal injuries of the sort alleged by the defendant. Indeed, as the Second Circuit has explained, where, as here, Congress "use[s] . . . the same language—in essentially the same context — [that language] carrie[s] with it the meaning" previously ascribed to it. United States v. Palozie, 166 F.3d 502, 504 (2d Cir. 1999). Accordingly, in United States v. Gunn — which relied on the Second Circuit's analysis in Zullo — the Seventh Circuit explained that the absence of "an applicable policy statement" does not "creat[e] a sort of Wild West in court, with every district judge having an idiosyncratic release policy." 980 F.3d 1178, 1180 (7th Cir. 2020). Rather, "[t]he substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons' . . . . In this way the Commission's analysis can guide discretion without being conclusive." Id. The Seventh Circuit's holding in Gunn is consistent with the approach adopted by district courts, including this Court, in this and other Circuits, both before and after Zullo. See, e.g., United States v. Thrower, No. 04-CR-903 (ARR), 2020 WL 6128950, at *3 (E.D.N.Y. Oct. 19, 2020) (explaining that, although "[t]he Sentencing Commission's policy statement explicating 'extraordinary and compelling reasons' under § 3582(c)(1)(A)(i) is not binding on a district court, . . . it does provide some guidance"); United States v. Ebbers, 432 F. Supp. 3d 421, 427 (S.D.N.Y. 2020) (explaining that, although § 1B1.13 is "anachronistic," it "is, nonetheless, helpful in defining a vague standard").

The Seventh Circuit's holding in Gunn that courts should continue to be guided by § 1B1.13 in construing the phrase "extraordinary and compelling reasons" is consistent with the Zullo panel's analysis. Indeed, the Zullo panel acknowledged that Congress intended for the phrase "extraordinary and compelling reasons" to have its settled meaning when the panel held that the definition of that phrase found in § 1B1.13 continues to apply to motions brought by the BOP. See 976 F.3d at 235–36 ("[W]e read the Guideline as surviving, but now applying only to those motions that the BOP has made."). And, as the Second Circuit has explained, "[w]hen a Congress that re-enacts a statute voices its approval

8

of an administrative or other interpretation thereof, Congress is treated as having adopted that interpretation." Isaacs v. Bowen, 865 F.2d 468, 473 (2d Cir. 1989) (quoting United States v. Bd. of Comm'rs of Sheffield, Ala., 435 U.S. 110, 134 (1978)); see also Lorillard, 434 U.S. at 580. So — putting aside Zullo's departure from the general rule that a statutory phrase should be understood to have a single meaning — this Court should look to § 1B1.13 as highly probative evidence of Congressional intent, and hold that § 3582(c)(1)(A)(i) at most confers upon district courts authority to grant compassionate release on grounds that are categorically similar to, if not constrained by, those set forth in § 1B1.13. See Gunn, 980 F.3d at 1180; see also United States v. Pinto-Thomaz, 454 F. Supp. 3d 327, 329 (S.D.N.Y. 2020) (holding that, under § 3582(c)(1)(A)(i), district courts have "discretion to grant compassionate release motions on grounds that are distinct from, but of similar magnitude and importance to, those specifically enumerated in Application Note 1 to U.S.S.G. § 1B1.13.").

In this case, the Court need not determine how far district courts' authority under the First Step Act extends beyond the factual circumstances identified in § 1B1.13, because, as the Third and Seventh Circuits have explained, that authority does not extend to purported legal injuries of the sort alleged by the defendant. In United States v. Handerhan, the Third Circuit denied the defendant's request for compassionate release and, in so doing, explained that § 3582(c)(1)(A) does not provide a mechanism by which defendants may seek "release on the basis of arguments . . . that were or could have been raised on direct appeal or in a § 2255 motion." 789 F. App'x 924, 926 (3d Cir. 2019). Similarly, in United States v. Arojojoye, the Seventh Circuit denied the defendant's compassionate release motion and explained that the defendant's claim that his sentence was unfairly disparate with his codefendants' "was really [an] attack [on] the length of his sentence," which the district court correctly construed as a successive § 2255 petition. 806 F. App'x 475, 477–78 (7th Cir. 2020); see also United States v. Rivernider, No. 10-CR-222, 2020 WL 597393, at *4 (D. Conn. Feb. 7, 2020) ("To my knowledge, nobody has suggested that the 'extraordinary and compelling' standard can be satisfied by claims of legal error or other alleged wrongs that are cognizable on direct appeal from a conviction or by means of a habeas corpus petition."). These cases provide further support for the proposition that, in the First Step Act, Congress intended the phrase "extraordinary and compelling reasons" to apply to a discrete set of personal circumstances other than rehabilitation, and not to purported legal injuries of the sort asserted by the defendant.[2]

Nor is the defendant's legal challenge to his sentence cognizable under § 3582(c)(1)(A) merely because it would be or would have been frivolous if raised on direct appeal or in a § 2255 motion. To conclude otherwise would be to hold that, in the First Step Act, Congress granted to district courts authority that subsumes and renders obsolete all other

---

[2] As the Second Circuit recently observed, "a compassionate-release motion is not an opportunity to second guess or to reconsider the sentencing court's original decision." United States v. Roney, --- F. App'x ----, 2020 WL 6387844, at *3 (2d Cir. Nov. 2, 2020) (citations and internal quotation marks omitted).

forms of post-conviction relief.  If Congress had intended to grant district courts such sweeping authority, it would have done so expressly, rather than through the intricate signaling identified by the Zullo panel, or through the happenstance of a dormant Sentencing Commission.  See Zullo, 976 F.3d at 234 (noting that § 1B1.13 has not been updated at least in part because the Sentencing Commission currently lacks a quorum of voting members).

Here, the defendant has raised a purely legal injury.  The defendant suggests that if he were sentenced today, the sentencing judge would not be bound by the Guidelines as Judge Nickerson was and therefore he may have received a lighter sentence.  In his view, the fact that the Guidelines are no longer mandatory (as they were when he was sentenced) constitutes an "extraordinary and compelling reason" for a sentence reduction.  However, this purely legal injury does not constitute an "extraordinary and compelling reason" for a sentence reduction.  For these reasons, the Court should deny the defendant's motion for a sentence reduction.

Nor does the COVID-19 pandemic constitute an extraordinary and compelling reason as to the defendant.  The defendant is 48 years old and has not suffered from any serious medical issues.  As many courts have held, a generalized risk of potential exposure to COVID-19 while in custody is, alone, an insufficient basis for release.  See United States v. Flores, No. 15-CR-152 (RRM) (E.D.N.Y. Apr. 12, 2020), ECF No. 47 ("[T]he Court cannot conclude that the BOP will be unable to manage a more widespread outbreak of the virus or will be unable to handle the medical needs of any inmate at MDC."); see also United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020) ("We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia.  But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.").  Relief is particularly unwarranted here where the defendant previously tested positive for COVID-19 and has seemingly recovered without complications.  According to medical records provided by the BOP, the defendant tested positive for COVID-19 on or about November 3, 2020 and was released from isolation on or about November 16, 2020.  Furthermore, as a result of the defendant's positive test, it is highly likely that the defendant now has antibodies to the virus and has some form of immunity from contracting it in the future.

2. The Section 3553(a) Factors Weigh Against Volpe's Release

Because Volpe has not met his burden to show that there are "extraordinary and compelling reasons" that might permit his release at this time, the Court need not proceed to the analysis under Section 3553(a) as to whether release is indeed warranted.  See 18 U.S.C. § 3582; U.S.S.G. § 1B1.13.  However, if a Section 3553(a) analysis were conducted, it would weigh overwhelmingly against Volpe's release.

As detailed above and set forth more fully during Volpe's trial, the defendant committed one of the most heinous crimes in New York City's history.  On August 9, 1997,

the defendant, in uniform as a New York City police officer sworn to protect and serve, brutally assaulted Patrick Antoine, while he was handcuffed and unable to defendant himself. He then repeatedly assaulted Abner Louima, who also was handcuffed and helpless, and then viciously sodomized him in the bathroom of the police station; when he was done, he threatened to kill Louima if Louima told anyone about the attack. Rather than accept responsibility for his crimes in a timely manner, he forced his victims to relive their respective traumas by testifying at trial. His actions were premeditated, brutal and brazen, evincing a clear belief that he was above the law and that his victims' lives, quite simply, did not matter. As Judge Nickerson aptly described, "short of intentional murder, one cannot imagine a more barbarous misuse of power." A sentence of 30 years – and not a lesser sentence – continues to be necessary to reflect the seriousness of the offenses, to promote respect for the law and to provide just punishment and adequate deterrence. 18 U.S.C. § 3553(a)(2)(A). Accordingly, even if there was an extraordinary and compelling reason for his release (there is not), release is unwarranted based on a consideration of the Section 3553(a) factors. See, e.g., United States v. Chambliss, 948 F.3d 691, 692 (5th Cir. 2020) (a affirming the denial of a motion for compassionate release despite the presence of "extraordinary and compelling reason for compassionate release" because a reduction would "minimizes both the impact of [appellant's] crime and seriousness of the offense"); Roney, 2020 WL 6387844, at *2 (affirming the denial of a motion for compassionate release because even if the defendant had an extraordinary and compelling reason for release, the district court did not abuse its discretion in finding release "unwarranted upon consideration of the 3553(a) factors").

## CONCLUSION

For the foregoing reason, the government respectfully submits that the defendant's motion should be denied.

    Respectfully submitted,

    SETH D. DUCHARME
    Acting United States Attorney

By:   /s/
    Elizabeth Geddes
    Assistant U.S. Attorney
    (718) 254-6430

cc:    Justin Volpe (Inmate No. 49477-053) (by First Class Mail)
      FCI Beaumont Low
      Federal Correctional Institution
      P.O. Box 26020
      Beaumont, TX 77720